Good morning, Counsel. How much time, if any, would you like to reserve for reply? Five, please, Your Honor. Certainly. You may proceed. May it please the Court, this appeal turns on a missing element, actual reliance. Under Section 523A2, the government had the burden to prove that the SB actually relied on a specific false statement in approving this loan. That's true so long as it's not an omission, correct? I believe it's both cases. You have to reply on a specific omission. I thought you can't rely upon something that isn't said, and I think that's aptly out of the Ninth Circuit, isn't it? I agree, Your Honor. Okay. But reliance goes both ways. It can be relying on an omission or it can be relying on a false statement. Either way, it works the same way, I believe, under the statute. It requires a fraud, which is knowing misstatement. In this case, the government offered no precipient witness. It offered after-the-fact testimony from a witness who had no role in the transaction and testified only about what the SBA would have done. So, counsel, under your theory, then, the only way the SBA could prove this or any lender could prove a borrower committed fraud would be to call the actual loan officer? No. You can call somebody who specifically has some context within which to… Well, this individual was supposedly a loan specialist who supervised the people that actually approved the loan, and he was familiar with the process and procedures of the SBA. So wouldn't that be the same as a precipient witness that you're describing? No, Your Honor. In each of the cases the government cites, there was somebody who had an actual involvement in the actual loan who supervised… So you have to have an actual individual who approved the loan, and under your theory, the lender can't otherwise come in with other testimony about its normal practices and procedures. Under Goodman v. Staples, a case the government conspicuously never addresses, Goodman is… That's the only case that you've cited, though, that has any indication that there is something wrong with calling an individual who is familiar with process and procedures, who looked at the loan application, who reviewed the loan agreement, and then came to certain conclusions. That is not the only case. The other case we cited is a case I believe from the central district of California. I don't have the specific site where the judge made it quite clear that where you have a witness who is testing to counterfactual assumptions, counterfactual assumptions, what the government did, what the lender… Was that action actually contrary to the loan agreement as well, though? I mean here the agreement says you're going to use this for working capital to address COVID problems, correct? Yes, it does. So if it wasn't used for working capital as a result of COVID, why isn't that enough to say that's the problem here? And we evaluate the actual intent rather than the reliance. There are two fundamental problems with that, Your Honor. First, it's ex post facto reasoning. No, it's part of the condition of the loan application, isn't it? It is a condition of the loan application, but there is no evidence that when Mrs. Shainman signed this loan… That's a question of fact, isn't it? That is a question of fact, but there is no evidence to the contrary in this case. Well, it gets to a definition of what working capital is and if it was caused by COVID. And since a large amount of this loan was used to pay professional expenses from a pre-COVID trial, it seems like, at least that's the clear import of the judge's decision, that would be contrary. There are two problems with that, if I may, Your Honor. The first is, let's go to working capital. Let's talk about that as a fact. It is undisputed that the probate litigation was attacking Mrs. Shainman's business. No. How was it attacking the business? Did it challenge her as a trustee? It sought, I believe incorrectly, but it clearly sought, and the record is quite clear in this case, that the other side sought to place a value on her trustee practice and to take that over as part of the petition in the probate course. Point one. Point two, it also sought to take over all of her property, her rental properties. Those are part of her business. They're also part of her residence, too, right? I mean, including her house, where she had her business, right? In addition to the properties that she had in Arizona and the properties she had in Idyllwild. How were those part of her trustee's practice? They're not part of her trustee practice. They're part of her residential real estate practice. She was renting them out, and she spent the money to protect those assets. But let's go back to the basic situation. But there's another problem, and that problem is that she lied about the fact that she was going to use this money to resolve pandemic-related problems. None of those problems were related to the pandemic. Your Honor, if you take a look at the statutory history, there is a presumption in the law that there is COVID injury to any person who applies, a presumption in the law. The statute specifically says that. When she filled it out, she was offered the application. She didn't seek it out. She was offered the application by the SBA. She understood that she was using working capital, and she did use it, in her view, for working capital. But the court rejected that theory, didn't it? It said that her decision that working capital was defined this way was not reasonable and it was not credible, and you rejected it. And that's a finding of fact, and we're bound by that fact. And you're bound by that fact. You are not bound by that fact. The court reviews de novo whether, one, discovery violations warrant exclusion. Two— What discovery violation did you allege in this case that you sought a motion to compel? We did not allege—first of all, let me mis—disabuse you of that notion. The rule does not require a motion to compel. The exclusion is automatic, automatic. Under Goodman v. Stables, under Yeti by Mali, the Ninth Circuit has made it clear that where you have a duty to disclose, the complaint alleged one fault, that she did not disclose the probate litigation because it would impact the collateral that she specifically was using. That wasn't the theory they went to trial on. That is precise. And that wasn't the theory that the judge ruled for summary judgment remain for trial in this case. And that is precisely why you need to reverse, because the rules are quite clear here, Your Honors. Where are you—let me— I want you to go back. You talk about the presumption that it's presumed that the injury was related to COVID, and we should presume that that's the case. That's a rebuttable presumption. We know that the injury occurred before COVID, so isn't the presumption rebutted? No, Your Honor. I think you misperceived the statute, as I understand it. It was applied across the board to a massive—the government was pouring money out right and left because they wanted to solve the economic problems that were facing this country. Caused by COVID. Caused by COVID. And so the statute specifically says working capital to allay a COVID-related injury. And then the statute specifically says there is a presumption that anybody who was involved in working during this period of time was injured. And I think the court can understand that because the effect was massive across the board. But the problem, I think, that we're having is you're taking two points and you're drawing a line that we don't see. Right. Because this was ongoing pre-COVID. So how was it related by COVID, except that it was a presumption, but we know that it came prior to COVID? Why doesn't that rebut it? Yeah, the presumption is not—it can be rebutted. It's not an irrebuttable presumption. There was no rebuttal of that presumption in this case. But don't the facts show us that it was rebutted? No, Your Honor. There is none, and the government— Well, she presented no evidence that she suffered any COVID-related injury. What she said was, I thought working capital could be described this way, and so I decided that I could use the money for this purpose. But I didn't suffer any COVID-related injury. She didn't put any evidence in that she suffered any, and the court found, as a matter of fact, she didn't try to present any evidence that she had any COVID-related injury. You are respectfully wrong on that. She specifically put in statistics information that showed that the filings in bankruptcy courts across the country and specifically in the Northern District of California were declining because of bankruptcy. And how did that impact needing to pay the attorneys from the probate action? Or the bankruptcy lawyers? You are to use working capital to allay—working capital is to protect your business, and she needed to protect her business, which was twofold. One, her trustee practice, which the bankruptcy—which the probate court specifically, and this is unrefuted, sought to monetize. Now, that may be wrong, and we all know it's wrong, but that's what they sought to do. Two, they sought to take over her revenue-producing rental properties, and she needed that to protect her assets, her business. It was a perfectly legitimate use of that. But let me go back to the fundamental issue. The government completely changed its theory. Its complaint alleged that the collateral was used and it was impaired by the probate litigation. Mid-trial, the government completely abandoned that and said, no, we didn't rely upon that. We relied upon the fact that she was supposed to prove a truthful thing. Now, the government has an obligation. Under those federal rules, quite clear, 26 says you need to supplement. If you take a look at their discovery responses, please do. They are completely opaque. Eighty percent of them gave absolutely no answer. Because they objected and you never sought to compel them to give a better answer. Because under the law, and I know because I helped draft these rules, under the law, under the rules, there is no requirement to file a motion. There is no requirement to do anything. The duty is upon the disclosing party or here the nondisclosing party to supplement its answers when it knows they are wrong. And we were completely, I hate to use these words, but we were completely sandbagged, ambushed when the government changed its trial completely. I asked the government's witness, did you rely upon the collateral? No. I asked each one of them, did you rely upon the collateral? No, because that wasn't within our ambit. And then they came in and said, well, she wasn't truthful. Had we known she wasn't going to be truthful, then we wouldn't have given her the loan. Well, that makes the whole process of reliance, fraudulent intent, everything completely illusory because every lender relies upon somebody to specifically, quote, be truthful. And you have to show specific reliance on specific facts. And here the government completely changed its course and there is no requirement to file a motion. As soon as we learned about this, when we got up to the trial, we filed motions in limine, which under Yeti versus Mali under the Ninth Circuit, under the Grouse River case under the Ninth Circuit, we are specifically not required to do that. It is incumbent upon the government to supply that information. I reserve the rest of my time for rebuttal. Thank you very much. Thank you very much, Your Honor. Oh, by the way, I reserve all of my other arguments in the brief. Understood. Thank you. Good morning, Your Honors, and may it please the Court. Assistant U.S. Attorney Kelsey Helland for the government. I'm joined by Assistant U.S. Attorney Audrey Pack. Your Honors, since Congress created the SBA in 1953, it has been authorized to issue loans to small businesses who are affected by disasters. In 2020, during the COVID pandemic, Congress moved quickly to expand the SBA's authority so that small businesses affected by the coronavirus pandemic could likewise obtain disaster relief loans. Billions of dollars of loans went out under that program, providing critical assistance to American small businesses at a time when the global pandemic was wrecking the economy. Appellant Lynn Shainman has been on the Bankruptcy Trustee Panel for 26 years. She's a sophisticated lawyer and businesswoman. She has never claimed that her business was affected by the coronavirus pandemic. Ms. Shainman took out an EIDL loan in 2021. When she signed the loan agreement for that loan, she promised the SBA that she would only use the proceeds for working capital to alleviate her injuries from the coronavirus pandemic. Is there any evidence in there about the rental business and the effect of it in the record on the trial? There was a little bit of trial testimony. As the Bankruptcy Court found, it was at trial that she said for the first time that she considered those rental properties to be part of her business. There's no evidence in the record that they were affected by the coronavirus pandemic. So there's nothing that would say that she thought she was using funds to alleviate injury from the pandemic, even if she was trying to protect her interest in those rental properties. As the Bankruptcy Court found, and the record is quite clear, that probate litigation was pre-existing before the coronavirus pandemic even started. So there's no way in which any injuries resulting from that probate litigation and the threat it had on her rental properties was an injury caused by the pandemic. Is that enough to deny the loan? Would that have been enough to deny the loan? Yes. Even if it was working capital? Yes, because she promised to only use the loan to alleviate her injury from the pandemic. That was the very purpose of the loan. So if she had indicated in the loan application that she intended to use the proceeds to pay attorneys in the probate litigation, to pay bankruptcy lawyers, and to pay experts in the probate litigation, would the loan have been approved? No, it would not have been approved. And I think we have multiple witnesses from the SBA who testified to that. Including Mr. Olivas? Including Mr. Olivas, but also including the two loan officers who actually did work on Ms. Shainman's loan. I want to be clear about this. The actual people who physically handled Ms. Shainman's loan did testify at trial. They did not submit evidence during the summary judgment briefing, and that was one of the issues that led to reconsideration, but they did testify at trial. The SBA wanted to present the full record on this and wanted to alleviate any concerns the bankruptcy court may have had about needing to have those witnesses who physically handled that loan. So two of them flew to San Francisco to testify, in addition to Mr. Olivas, who supervised and was responsible for putting together the manual and the instructions for how these loans were handled. So there was multiple sources of evidence at the trial about how the loan would have been rejected if the SBA knew how she was actually going to use the proceeds, contrary to what she promised in the loan agreement that she signed. So that was our first theory of non-dischargeability. The 523A2A theory. There's also the 523A2B theory. Before you get to that, I want to go back to one of the questions I asked your opposing counsel. Do you agree with the statement of law that in an omission as fraudulent, the plaintiff must prove reliance? I do think that is still true, Your Honor, but I think the reliance can be shown by the lender following its normal business practices. And if the disclosure, if the material omission would have changed the process for reviewing that loan, then reliance has been shown, material reliance has been shown, which I think there's adequate evidence of here. And those are findings of fact that the Bankruptcy Court made, that there was reliance and it was material. So clear error review. So I want to be clear that our theory about the omission of the contingent liability has been consistent throughout this case. It's present in the complaint. It was the major subject of the summary judgment briefing. Mr. Olivas' declaration in support of the summary briefing talks about reliance on that omission and how if the contingent liability of legal claims against Ms. Shaman had been disclosed, then an entirely additional level of review would have been conducted, which may well have resulted in denying the loan. That was all in the evidentiary record well before we went to trial. There was not a bait-and-switch or last-minute change of theory. There is a consistent through-line from our complaint to the dispositive motion briefing to the testimony at trial that for 523A2B, the omission of the legal claims against Ms. Shaman in that probate litigation was the material omission. That was the fraud in her written statement about her financial condition that renders the balance of the loan non-dischargeable. It is true that at trial, the SBA witnesses also talked about how her dishonesty may have been an independent basis for denying the loan. But that is not the basis that the Banks of the Court relied on in finding that the loan was non-dischargeable. It was a side issue, and to be clear, there was quite a bit of testimony about how the legal claims themselves, the failure to disclose the legal claims against Ms. Shaman, was itself a material omission upon which the SBA reasonably relied. That is, it would have changed how it evaluated that loan if it had known about those claims against her. And it is those claims against her that immediately rendered her unable to repay the SBA. It is because she was on the verge of losing a probate trial that she promptly declared bankruptcy and still has not been able to repay the SBA for the nearly million-dollar loan that it made to her. Well, but for the bankruptcy, as it has been revealed through the facts, she would have had over $400,000 to continue to make the payments. Would that have been consistent with the SBA loan application and agreement? I'm not sure I understand your question, Your Honor. She kept the $450,000 in her brokerage account. Yes. Is that consistent with the loan application and agreement that she signed? I don't think that it is, Your Honor. That itself is not a use of funds for alleviating economic injury from the COVID pandemic. And as the Bank of Sweden Court recognized, her taking of that amount of money denied the SBA's ability to issue that money to other borrowers who would have needed it, right? So that was not a proper use of those funds. Unless there are other questions about those two claims for non-dischargeability, I wanted to turn to the penalty briefly. Much has been made about the use of the collateral, that issue. Do you want to address that before you move on to the penalty? Yeah. I don't think that the SBA pleaded in its complaint or needed to prove at trial that actually relying on the collateral was an aspect of its reliance or an aspect of the fraud here. What was testified to at trial and what has been the consistent main theory since the complaint was pled was that the omission of the claims against her prevented the SBA from performing the review that it would otherwise perform and understanding her financial picture. So, no, the court doesn't need to get into, and the Bank of Sweden Court didn't make a finding about the reliance on the collateral itself. What the banks found and consistent with our theory all along has been that merely omitting the claims against her was sufficient to hide from the SBA a material aspect of its review. So, no, I don't think you need to get into how the collateral would have been used. Thank you. And just to clarify, you're suggesting that the failure to disclose the use of the proceeds in the loan application, which was not related to the pandemic, which was for a pre-petition or pre-pandemic litigation purpose, would have been a false statement to the SBA under 523A2A, and that was what the court found. Under that provision. That's exactly right. And I just want to be very clear on this. These are independent theories of fraud, right? 523A2A is the loan agreement where she made the promise for how she would use the funds. The entire balance of the loan is non-dischargeable because of that fraud. That is completely separate with the application where she omitted the legal claims against her under 523A2B. That itself is an independent theory of fraud that also results in the full balance of the loan being non-dischargeable. They are completely independent, and the banks of the court found that both apply here, right? So either one would be sufficient to affirm non-dischargeability of the full loan. I think both were plainly correct, and the banks of the court did find both. As to the penalty, Your Honors, the law is clear that when an individual misuses funds that were taken out under this loan program, that they will be subject to a one-and-a-half times penalty of the entire loan balance. The banks of the court found that Ms. Shaman intentionally misused these funds, right? In going through the elements for the A2A claim and the A2B claim, he found intentional misuse. So whether the statute, you know, the level of intent required to award a penalty under this statute, this court doesn't need to decide some question about just how much is enough. Here there was intentional misuse, a factual finding by the banks of the court. So I don't think appellant can be heard to complain that somehow the wrongfulness standard was not satisfied here when the banks of the court found intentional misuse. I think the banks of the court was well within its discretion in applying that penalty to the full value of the loan. There was no good reason to issue a penalty less than one-and-a-half times the full amount. I don't think appellant's constitutional arguments or statutory arguments are well taken on this regard. This was plainly a disaster loan under Section 7B of the Small Business Act. There's about a dozen different ways that it was described as a disaster loan. So to argue somehow that this was actually a loan under a different program and the penalty wouldn't apply, I don't think survives any level of scrutiny. The loan agreement itself described the 636B provision as being applicable to this loan. Exactly. And the loan agreement itself said this is a disaster loan under 7B, right? And then the end of it said the penalty provision 636B will apply to this if you wrongfully misuse the loans. It's clear from the face of it. It's also just very clear as a matter of the statute. This was an economic injury disaster loan to which the penalty applied. I'm happy to address the constitutionality arguments, but I don't need to take your Honor's time unless there's questions about them. I don't have any. Your Honors, unless there are any further questions, we would ask that this Court affirm the Bank of the City Court judgment. Thank you. Anything else? Thank you very much, Counsel. Thank you. Mr. Keeve, I think you have about 319. Thank you, Your Honor. The two witnesses who supposedly worked on this loan did not testify about reliance or what the SBA would have done under certain counterfactual assumptions. So that argument does not fly. Working capital is nowhere defined in the statute and the regulations. It simply says working capital. And given that ambiguity, I believe that Ms. Shainman's – Isn't that a little hard to believe given the sophistication and nature of your client? Isn't – again, that's a question of fact, right? What she believed and understood, that was for the bankruptcy judge at trial to ultimately decide, correct? There's no finding, I believe, that she somehow misunderstood the term. No, I think it was more than that. I think the court just didn't believe her. I don't think you have to say I don't believe you. Given all the other findings, isn't that implicit that he did not believe that she really didn't have a true sense of what working capital meant? Broad requires specific requirements of a finding, not implicit findings based upon some supposition. Well, it was that she – I believe his quote at working capital and what it was and that it was – how did he put it? He actually said a professional should understand the difference between business expenses, also characterized as working capital, and expenses incurred during personal litigation between family members, however characterized. Isn't that specific enough? I don't believe so because specifically she's testified without contradiction that this was a – Credibility is always an issue at trial. Excuse me? Credibility is always an issue at trial, isn't it? The quantity and quality of the evidence is an issue of law for this court, Your Honor, I believe, in its review. And if you take a look at the Anderson case, it makes it quite clear. Let me go back to another point that Mr. Howland raised. The application does not ask anywhere how are you going to use these funds. But it does say that it will be used for working capital to address COVID issues. Economic injury caused by COVID. And I believe that given the fact that all of the cases were declining in the bankruptcy court, she was entitled to assume that there was going to be some damage to her injury. So she used the money to alleviate her COVID-related injury by doing what? Paying professionals in the probate litigation? Absolutely, Your Honor. And her bankruptcy, prepaying bankruptcy fees. Excuse me? Prepaying for her bankruptcy filing. Correct, because she was carrying on a business in bankruptcy and she needed to have counsel. So that was necessarily being used for working capital to alleviate economic injury. Let me go to one other point. Isn't that a question of fact? The connection. As I say, let me go back to my reliance point. You need to have some reliance on this by the government. And there's no evidence of that. This is sustainable, Your Honor. Let me go to the misuse. Well, let me first of all, in terms of the fraud case was that she failed to check off a box that says contingent liabilities. It didn't ask her, are you a defendant in a lawsuit? Other SBA forms do that. She testified had she been asked that, she, of course, wouldn't have answered it. But in terms of the misuse, there was no willful misuse under the statute, which requires a mens rea. I see my time has expired, Your Honor. Thank you for your time.  I appreciate it. Unless the court has any other further questions, we rest on our briefs. Thank you. Thank you very much. Thank you both for a very good oral argument. The court will take the matter under submission, try to gather a decision as soon as possible.
judges: Spraker, Gan, Corbit